# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| CAROL A. TOBIN, Individually and as the | § | |
| Special Administratrix of the Estate of William | § | |
| F. Tobin, MEGGAN VAN NESS, and KELLY | § | |
| BEAR, | § | |
| | § | No. 3:08-cv-00697-M |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| AMR CORPORATION, | § | |
| AMERICAN AIRLINES, INC., and | § | |
| AMERICAN EAGLE AIRLINES, INC., | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendants' Motion for Summary Judgment [Docket Entry #66].  For the reasons stated below, the Motion is **GRANTED IN PART** and **DENIED IN PART**.

### *Background*

This case is a wrongful death action brought by the family and estate of decedent William Tobin.  On May 8, 2007, William Tobin, 58, and his wife, Carol, were traveling from Providence, Rhode Island, to their home in Las Vegas, Nevada.  Their trip was comprised of two flights: the first leg was from Providence to Chicago's O'Hare International Airport, on a plane operated by American Eagle Airlines, Inc. ("American Eagle"), and the second was from O'Hare to Las Vegas, on a plane operated by American Airlines, Inc. ("American Airlines").  On the first leg of the trip, mechanical problems caused them to arrive at O'Hare approximately one hour and fifteen minutes later than scheduled.  As a result, they had relatively little time to reach the gate for their connecting flight.  After the Tobins arrived at O'Hare, Mrs. Tobin, who is confined to a

1

wheelchair, was helped off the airplane and into her wheelchair by airport personnel.  Then, Mr.

Tobin began pushing her wheelchair.  When the Tobins exited the jetbridge, Mr. Tobin asked the

American Eagle gate agents how to best reach their connecting gate.  According to Mrs. Tobin, a

gate agent responded that the connecting flight would be leaving in ten or fifteen minutes, and

that "in the time that you are standing here talking to me about this, you could be there."  Mr.

Tobin then ran to the connecting gate, pushing his wife in her wheelchair and carrying luggage.

After boarding the plane, Mr. Tobin was suddenly stricken by a devastating medical event,[1] as a

result of which his body became rigid, and he was involuntarily "wedged," in a standing

position, with his face pressed against the overhead compartment.  Several passengers, including

a medical doctor, a registered nurse, two uniformed off-duty American Airlines flight attendants,

and the flight crew responded to assist Mr. Tobin.  One crewmember attempted to use an

automated external defibrillator (AED) to help revive Mr. Tobin, but before he used the device,

paramedics arrived and assumed control of Mr. Tobin's treatment.  Efforts to revive Mr. Tobin

failed, and he was later pronounced dead at a local hospital.

On April 22, 2008, Carol Tobin, individually and as the Special Administratrix of the

Estate of William Tobin, and the Tobins' daughters filed suit against American Airlines, Inc.,

American Eagle Airlines, Inc., and their parent entity, AMR Corporation.[2]  In the First Amended

Complaint, Plaintiffs claim Defendants[3] (1) were negligent in suggesting that the Tobins make

their own way to their connecting flight; (2) failing to train their employees in the proper use of

an AED; and (3) failing to train their employees to properly assist handicapped passengers

---

[1] The Plaintiffs contend Mr. Tobin suffered a heart attack and though the defense disagrees, the medical nature of the event is irrelevant for purposes of this Motion, and the analysis will assume it was a heart attack.

[2] Since the filing of the lawsuit, the parties have stipulated that AMR Corporation is entitled to a take-nothing judgment, and therefore this Opinion addresses only the claims against American Airlines, Inc. and American Eagle Airlines, Inc.

[3] As Defendants note, Plaintiffs use the term "Defendants" confusingly in their Complaint and briefing, often not differentiating which Defendant acted when.  The Court will, when possible, clarify which Defendant is the object of the claim.

transferring gates.  Plaintiffs also advance a negligence *per se* theory, stemming from alleged

violations of the Air Carrier Access Act ("ACAA") and its accompanying regulations.[4]

Defendants seek summary judgment on all claims against them.

*Summary Judgment Standard*

Summary judgment is warranted when the facts and law, as reflected in the pleadings,

affidavits and other summary judgment evidence, show that no reasonable trier of fact could find

for the nonmoving party as to any material fact.[5]  "The moving party bears the initial burden of

identifying those portions of the pleadings and discovery in the record that it believes

demonstrate the absence of a genuine issue of material fact, but is not required to negate

elements of the nonmoving party's case."[6]  Once the movant carries its initial burden, the burden

shifts to the nonmovant to show that summary judgment is inappropriate.[7]

The nonmovant is then required to go beyond the pleadings and designate specific facts

that prove the existence of a genuine issue of material fact.[8]  In determining whether genuine

issues of material fact exist, factual controversies are construed in the light most favorable to the

nonmovant, but only if both parties have introduced evidence showing that a controversy exists.[9]

A district court properly grants summary judgment if, when viewing the facts in the light most

favorable to the nonmovant, the movant shows that there is no genuine issue of material fact and

that the movant is entitled to a judgment as a matter of law.[10]

---

[4] 49 U.S.C.A. § 41705 (West 2007); 14 C.F.R. § 382.39.
[5] *See* Fed. R. Civ. P. 56; *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986).
[6] *Lynch Props., Inc. v. Potomac Ins. Co.*, 140 F.3d 622, 625 (5th Cir. 1998) (citing *Celotex*, 477 U.S. at 322-25).
[7] *Fields v. City of S. Houston*, 922 F.2d 1183, 1187 (5th Cir. 1991).
[8] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).
[9] *Lynch Props.*, 140 F.3d at 625; *see also Keelan v. Majesco Software, Inc.*, 407 F.3d 332, 338 (5th Cir. 2005).
[10] Fed. R. Civ. P. 56(c).

*Choice of Law*

An issue that is central to several of the claims and defenses is which state's law applies to each issue.[11]  Under Texas law, when presented with a choice of law question, the Court must first determine whether there is a conflict between the laws of the jurisdictions whose law potentially controls.   Only when such a conflict is present should the Court conduct a choice of law analysis.  Conflicts of law in Texas tort cases are governed by the "most significant relationship" test, stated in Sections 6 and 145 of the Restatement (Second) of Conflict of Laws. Section 6 establishes the general principles of the Restatement,[12] and Section 145 identifies the following factors as relevant to a choice of law analysis of a tort claim: (a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered.[13]  In tort cases, "the applicable law will usually be the local law of the state where the injury occurred."[14]  The court need not *sua sponte* analyze choice of law issues unless raised by the parties.[15]

---

[11] Under Texas choice of law rules, the choice of law analysis applies to each claim or issue individually.  *See Hughes Wood Prods., Inc. v. Wagner*, 18 S.W.3d 202, 204 (Tex. 2000).

[12] Restatement (Second) Conflict of Laws § 6.  "(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.  (2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include: (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied."

[13] *Torrington Co. v. Stutzman*, 46 S.W.3d 829, 848 (Tex. 2000); *Gutierrez v. Collins*, 583 S.W.2d 312, 318 (Tex. 1979).

[14] Restatement (Second) Conflict of Laws § 156(2).

[15] *See Crisman v. Cooper Indus.*, 748 S.W.2d 273, 276 (Tex. App.–Dallas 1988, writ denied).

4

*Substantive Arguments*

## I.  Proximate Cause

### A.  Common-Law Negligence

Defendants seek summary judgment on Plaintiffs' common law negligence claims, urging that none of the Defendants' acts or omissions were a proximate cause of William Tobin's death and that it was unforeseeable as a matter of law.  They argue that because Mr. Tobin appeared to be healthy, and none of Defendants' employees were aware of Mr. Tobin's medical condition, it was not reasonably foreseeable that he would suffer a heart attack after hurrying to the connecting gate and boarding.  Plaintiffs counter that the injury was foreseeable, and that under either Illinois or Texas law, Defendants' actions were the proximate cause of Mr. Tobin's injury.  Plaintiffs argue that proximate cause is a more generalized inquiry than Defendants suggest, and that Defendants need not have foreseen that Mr. Tobin *would* suffer a fatal medical emergency as a result of the Defendants' alleged negligence, but only that he might suffer the type of injury he did as a result of the alleged negligent conduct.  Plaintiffs argue that Defendants had actual notice of heart attacks having occurred under similar circumstances. Plaintiffs cite a New England Journal of Medicine article, co-authored in 2000 by Dr. David McKenas, an American Airlines Medical Director, which states "[t]he aircraft is a unique setting for cardiac arrest, and air travel may expose or exacerbate medical conditions.  Contributing factors include the stress associated with flying, [and] exertion in reaching the gate . . . ."  The article details multiple cardiac incidents occurring in airplanes.  Plaintiffs also cite to an American Airlines press release, which notes that one of its passengers was saved by an AED after having a heart attack while rushing to catch a connecting flight at Dallas/Fort Worth

International Airport.  Plaintiffs argue that this evidence shows that Defendants had actual notice of repeated similar incidents.

Under Texas law, the components of proximate cause are cause in fact and foreseeability.[16]  The test for cause in fact is whether the negligent "act or omission was a substantial factor in bringing about injury," without which the harm would not have occurred.[17]  Cause in fact is not established if the defendant's negligence did no more than furnish a condition which made the injury possible.[18]  "The evidence must go further, and show that such negligence was the proximate, and not the remote, cause of resulting injuries . . . [and] justify the conclusion that such injury was the natural and probable result thereof."[19]  Foreseeability requires that a person of ordinary intelligence should have anticipated the danger created by a negligent act or omission.[20]  The danger of injury is foreseeable if its "general character . . . might reasonably have been anticipated."[21]  The question of foreseeability asks whether the injury "might reasonably have been contemplated" as a result of the defendant's conduct.[22]

In Illinois, the law is essentially identical.  The test that should be applied in all proximate cause analyses is "whether the first wrongdoer reasonably might have anticipated the intervening efficient cause as a natural and probable result of the first party's own negligence."[23]  If the negligence does nothing more than create a condition that makes the injury possible, and the injury is caused by a third person, the creation of the condition is not a proximate cause of the

---

[16] *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 477 (Tex. 1995); *Travis v. City of Mesquite*, 830 S.W.2d 94, 98 (Tex. 1992).

[17] *Prudential Ins. Co. of Am. v. Jefferson Assoc., Ltd.*, 896 S.W.2d 156, 161 (Tex. 1995).

[18] *See Bell v. Campbell*, 434 S.W.2d 117, 120 (Tex. 1968).

[19] *Carey v. Pure Distrib. Corp.*, 124 S.W.2d 847, 849 (Tex. 1939); *see Boyd v. Fuel Distribs., Inc.*, 795 S.W.2d 266, 272 (Tex. App.–Austin 1990, writ denied).

[20] *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 549-50 (Tex. 1985).

[21] *Id.* at 551 (quoting *Carey*, 124 S.W.2d at 849) (emphasis omitted).

[22] *McClure*, 608 S.W.2d at 903.

[23] *First Springfield Bank & Trust v. Galman*, 720 N.E.2d 1068, 1072 (Ill. 1999).

injury.[24]  Illinois courts also sometimes employ an alternate test, set out in *Lee v. Chicago Transit Authority*,[25] which breaks down the proximate cause inquiry into "cause in fact" and "legal cause" questions, an approach very similar to that used in Texas.  The Illinois Supreme Court has said that the above tests are functionally equivalent.[26]

The Court concludes that the applicable laws of Texas and Illinois do not conflict, and so a detailed choice of law analysis is unnecessary.  However, on the merits, summary judgment is inappropriate.  The evidence, construed as it must be in the best light for Plaintiffs, shows that upon arrival, American Eagle's gate agent suggested that Mr. Tobin, 58, carrying luggage and pushing his wife in a wheelchair, run to another gate so he and his wife could make their connection to American Airlines.  The record does not reflect that anyone from American Airlines gave special assistance when they arrived.  The injury Mr. Tobin suffered was of the kind that is reasonably foreseeable from the acts claimed to be negligent, and there was no unusual intervening cause.  All that is required at the summary judgment stage is that a reasonable jury could conclude that the negligent actions proximately caused Mr. Tobin's injuries, and a jury could so conclude here.

B.  Negligence *Per Se*

Defendants also argue that Plaintiffs' negligence *per se* claim, which is based on alleged violations of the ACAA, fails as a matter of law.  The elements of a negligence *per se* claim under Illinois law are: (1) the plaintiff belongs to the class of persons the statute was designed to protect; (2) the plaintiff's injuries are of the type against which the statute was designed to protect; and (3) the violation proximately caused the plaintiff's injury.[27]  Like in Illinois, in

---

[24] *Id.* at 1072.
[25] 605 N.E.2d 493 (Ill. 1992).
[26] *First Springfield*, 720 N.E.2d at 1072-73.
[27] *Camp v. TNT Logistics Corp.,* 553 F.3d 502, 506 (7th Cir. 2009).

Texas, a plaintiff seeking to establish negligence *per se* must show that he suffered the type of injury against which the statute is designed to protect, and "liability does not result from every act of negligence per se; [but] only . . . when the injury or damages are a proximate result of that negligence."[28]  Defendants are entitled to summary judgment on this claim for three reasons: first, Mr. Tobin was not "disabled" under ACAA, and therefore was not a member of the class of persons the statute is designed to protect; second, the claim arises out of a different type of injury than contemplated by the statute; third, proximate cause is lacking.

The ACAA was designed to protect disabled persons, and Mr. Tobin, the one suffering the injury, was not disabled.  Plaintiffs attempt to characterize the harm as having been done to Mrs. Tobin, in an attempt to establish that the person injured was disabled.  The Court rejects that characterization; the wrongful death claim stems from injuries suffered by Mr. Tobin, who is not a member of the class protected by ACAA.  Second, it is clear that Mr. Tobin's attack was entirely different from the harm contemplated by ACAA, which is designed to protect disabled persons from discrimination during air travel.[29]  The harms the Tobin family suffered from the death of Mr. Tobin, such as the loss of Mr. Tobin's companionship, are also entirely different from the harms contemplated by the statute.  Further, the Plaintiffs cannot show that any violation of ACAA was a proximate cause of Mr. Tobin's death, as it is not reasonably foreseeable that the failure to provide an electric cart to a wheelchair-bound passenger during a gate change would result in a person assisting the disabled passenger, who himself had no obvious and apparent signs of a serious health condition, to have a heart attack.

---

[28] *Mo. Pac. R.R. Co. v. Am. Statesman*, 552 S.W.2d 99, 103-04 (Tex. 1977).

[29] *See* 14 C.F.R. § 382.1 ("The purpose of this Part is to carry out the Air Carrier Access Act of 1986, as amended. This rule prohibits both U.S. and foreign carriers from discriminating against passengers on the basis of disability; requires carriers to make aircraft, other facilities, and services accessible; and requires carriers to take steps to accommodate passengers with a disability.").

## II.      Illinois AED Immunity Statute

Plaintiffs assert that American Airlines' agents were negligent in (1) failing to use the

AED on board the aircraft to resuscitate Mr. Tobin; (2) failing to maintain the AED in proper

working condition; and (3) failing to properly train crew members in its use.  American Airlines

claims that it is entitled to immunity from Plaintiffs' AED-related claims because it has statutory

immunity from those claims under Illinois law.  The parties agree that Illinois law applies to

these claims, but disagree on whether Illinois law gives American Airlines immunity.[30]  The

Illinois Automated External Defibrillator Act ("the AED Act") provides that "[a]n AED user is

not liable for civil damages as a result of any act or omission involving the use of an automated

external defibrillator in an emergency situation, except for willful or wanton misconduct, if the

requirements of this Act are met."[31]  American Airlines claims immunity under the version of the

statute in effect at the time of Mr. Tobin's death, and alternatively, under the most recent version

of the statute, which it argues should apply retroactively to this case.  The AED Act in effect in

May 2007 provides as follows:

> (a) A person acquiring an automated external defibrillator shall take reasonable
> measures to ensure that:
>
> (1) the automated external defibrillator is used only by trained AED users;
>
> (2) the automated external defibrillator is maintained and tested according to
> the manufacturer's guidelines;
>
> (3) the automated external defibrillator is registered with the EMS system
> hospital in the vicinity of where the automated external defibrillator will
> primarily be located which shall oversee utilization of the automated external
> defibrillator and ensure that training and maintenance requirements are met;
> and

---

[30] The parties agree that Illinois law applies to this issue.
[31] 745 Ill. Comp. Stat. § 4/30 (d) (2007).  Unlike the Sections discussed below, this portion of the AED Act has not been amended.

(4) any person who renders out-of-hospital emergency care or treatment to a person in cardiac arrest by using an automated external defibrillator activates the EMS system as soon as possible and reports any clinical use of the automated external defibrillator.

(b) A person in possession of an automated external defibrillator shall notify an agent of the local emergency communications or vehicle dispatch center of the existence, location, and type of the automated external defibrillator.[32]

Plaintiffs argue that American Airlines fails to offer any summary judgment evidence to establish that it has satisfied the registration requirement of Section (a)(3) and the notice requirement of Section (b). American Airlines has not complied with the requirements as written, but asserts that it is nevertheless immune under the statute. It first points to the Declaration of Marsha Reekie, Lead Nurse and AED Coordinator for American Airlines, who opines that because the Federal Airline Administration (FAA) requires AEDs on all large aircraft, American Airlines does not need to notify an emergency services agent pursuant to Section (b). American Airlines also argues that it would be practically impossible for it to register AEDs installed in airplanes with the nearest hospital, because airplanes change locations several times per day. In the reply brief, American Airlines argues it has "substantially complied" with the requirements of the AED Act, and claims that substantial compliance is all that is required by Illinois law. American Airlines further asserts that the purpose of the AED registration requirement is to provide emergency services operators with information about AEDs, and that because of FAA regulations, emergency services operators know that every passenger plane has an AED onboard. American Airlines argues that "[t]here is simply nothing more that an air carrier can do to comply with this part of the Act."

In support of the "substantial compliance" argument, American Airlines cites two cases in which an Illinois appellate court held that a party's substantial compliance with a statute is

---

[32] 410 Ill. Comp. Stat. § 4/20 (2000).

sufficient to justify the extension of its benefits.  In *McClintock v. Bi-State Development Agency*,[33] the plaintiff's lawyer, within a week of his client's injury, had sent a letter advising a state agency of the injury, stating that his client would sue if his demands were not met.  He then sued, and the defendant moved for summary judgment, asserting a lack of compliance with the Illinois Tort Immunity Act, which, among other things, required giving notice of the name of the treating physician, details of the accident, and the plaintiff's address.  The plaintiff's lawyer's letter did not state the plaintiff's address or the name of the treating physician.  The court held that the plaintiff's suit was not barred, because of "substantial compliance" with the Act, finding its purpose was to require notice to a state agency of an imminent suit, which the demand letter did.  In *Aluma Systems, Inc. v. Frederick Quinn Corp.*,[34] the court considered whether substantial compliance with a mechanic's lien statute satisfied the purposes of the statute.  The statute required a prospective lienholder to send notice to the head of the Illinois Capital Development Board, but the plaintiff had notified the agency, not the individual official.  Upon realizing its mistake, the plaintiff made several efforts to notify the correct public official, and contacted other individuals with interests in the development.  Under these circumstances, the court found substantial compliance satisfied the statutory notice prerequisite for a lien.[35]

American Airlines argues it substantially complied with the Illinois statute, entitling it to the protections of the AED Act.  Based on the limited evidence before it, the Court disagrees.  Under Illinois law, the primary aim of statutory construction "is to ascertain the legislative intent, which may be discerned from the history of the legislation or from the use of the terms in other

---

[33] 591 N.E.2d 967, 971 (Ill. App. Ct. 1992).
[34] 564 N.E.2d 1280, 1290-92 (Ill. App. Ct. 1990).
[35] *Id*. at 1292-93.

sections of the same or other Illinois statutes."[36]  The legislative intent is reflected in the version

of the AED Act in effect in May 2007:

> The General Assembly finds that timely attention in medical emergencies saves
> lives, and that trained use of automated external defibrillators in medical
> emergency response can increase the number of lives saved.  It is the intent of the
> General Assembly to encourage training in lifesaving first aid, to set standards for
> the use of automated external defibrillators and to encourage their use.[37]

As the United States Supreme Court has explained, "[i]t is a cardinal principle of

statutory construction that a statute ought, upon the whole, to be so construed that, if it can be

prevented, no clause, sentence, or word shall be superfluous, void, or insignificant."[38]

Defendants have submitted no evidence that the Illinois legislature intended to exempt airlines

from the requirements of the statute, nor have they provided a basis for this Court to conclude

that FAA requirements render portions of the statute inapplicable to American Airlines.  In the

Court's view, neither *Aluma Systems* nor *McClintock* supports the conclusion that substantial, but

incomplete, compliance is sufficient for an entity to claim the benefits of an *immunity* statute.

The Court thus denies summary judgment for American Airlines under the May 2007 version of

the AED Act.

As an alternative, American Airlines asserts that it is entitled to immunity under the most

recent version of the AED Act, which it claims should be applied retroactively.  The AED Act's

August 2007 amendments removed the AED registration requirement, but retained the

notification requirement.  Under Illinois law, a statutory amendment will only be given

retroactive effect if the legislature has "expressly prescribed the statute's temporal reach,"[39] and

made it retroactive.  Illinois has adopted the two-step approach taken by the United States

---

[36] *Koenig v. McCarthy Const. Co.*, 100 N.E.2d 338, 344 (Ill. App. Ct. 1951).
[37] 1999 Ill. Legis. Serv. P.A. 91-524 (S.B. 458) (West) (Public Act 91-524, Medical Practice—Automatic External Defibrillator Act).
[38] *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001).
[39] *Allegis Realty Investors v. Novak*, 860 N.E.2d 246, 252-55 (Ill. 2006).

Supreme Court in *Landgraf v. USI Film Products*,[40] which first looks to whether the legislature expressed a specific intent to make an amendment retroactive. If it did, the statute applies retroactively. If not, a court determines whether it can infer a legislative intent to make the law retroactive. However, the Illinois Supreme Court has construed the general savings clause of Illinois' Statute on Statutes[41] as prohibiting retroactive application absent express legislative intent.[42] Therefore, "an Illinois court need never go beyond step one of the *Landgraf* test."[43] Defendants admit that there is no express provision making the amendments to the AED Act retroactive; thus, under Illinois law, the August 2007 amendments do not apply to this case.[44]

## III.    Illinois Good Samaritan Act

American Airlines argues that it is entitled to immunity under the Illinois Good Samaritan Act for claims arising from attempts by American Airlines' agents to use CPR on Mr. Tobin. Plaintiffs agree that Illinois law applies, but argue that Defendants are not entitled to immunity.[45] The Samaritan Act provides, in pertinent part:

> Any person currently certified in basic cardiopulmonary resuscitation who complies with generally recognized standards, and who in good faith, not for compensation, provides emergency cardiopulmonary resuscitation to a person who is an apparent victim of acute cardiopulmonary insufficiency shall not, as the result of his or her acts or omissions in providing resuscitation, be liable for civil damages, unless the acts or omissions constitute willful and wanton misconduct.[46]

The disagreement between the parties centers on the phrase "not for compensation" as a limitation on American Airlines' entitlement to immunity. Illinois courts have not ruled on the

---

[40] 511 U.S. 244 (1999).
[41] 5 Ill. Comp. Stat. 70/4 (1998).
[42] *Allegis Realty Investors*, 860 N.E.2d at 253.
[43] *Id.*
[44] The Illinois Good Samaritan Act also provides an exemption from civil liability for those using AEDs, but it is "as provided in Section 30 of the Automated External Defibrillator Act." The current version of the Good Samaritan Act was not in force at the time of Mr. Tobin's death, and therefore it cannot govern the issue retroactively.
[45] Plaintiffs seem to concede that the off-duty flight attendants are entitled to immunity under the Samaritan Act, but claim that on-duty flight attendants are not, because they worked "for compensation."
[46] 745 Ill. Comp. Stat. § 49/10 (1998).

proper scope of that phrase in this section of the Samaritan Act, but several Illinois intermediate appellate courts have held that the phrase "without fee," as used in other sections of the Samaritan Act, immunizes doctors responding to emergencies, even though they do so as part of their normal job responsibilities, so long as they do not charge a fee specific to the particular incident.[47]  Under this approach, doctors are immune from suit, so long as they do not derive a direct benefit from assisting in the emergency giving rise to the suit.  The most recent Illinois appellate case to follow this approach, *In re Heanue*, stated that "[t]he legislature could have easily said that . . . immunity . . . is available to those who provide emergency care without deriving any economic benefits, but it did not.  It specifically chose the term 'fee.'"[48]

Plaintiffs claim the Samaritan Act's use of the phrase "not for compensation" establishes a narrow entitlement to immunity.  Essentially, Plaintiffs argue that because the on-duty flight attendants were compensated for their normal job activities, which included providing emergency services when warranted, the immunity statute should not apply to them.  Defendants argue that Illinois has a long history of extending immunity to doctors responding to emergencies.  They argue that "surely the Illinois legislature did not intend the illogical result of protecting doctors providing assistance but not flight attendants."

The phrase "not for compensation," rather than "without fee," indicates a broader restriction on immunity than applies to doctors.  In *In re Heanue*, the court concluded that a "fee" "envisioned a very specific sort of relationship where the economic benefit is derived

---

[47] *In re Heanue*, 823 N.E.2d 1123 (Ill. App. Ct. 2005); *see Johnson v. Matviuw*, 531 N.E.2d 970 (Ill. App. Ct. 1989).
[48] *In re Heanue*, 823 N.E.2d at 1129.  *See Rodas v. SwedishAmerican Health System Corp.*, 594 F. Supp. 2d 1033 (N.D. Ill. 2009) (holding that, under Illinois law, doctors were immune from civil damages under the Samaritan Act because they did not derive economic benefit directly from the service performed).  *But see Henslee v. Provena Hospital*, 373 F.Supp. 802 (N.D. Ill. 2005) (holding that the Samaritan Act does not immunize doctors from suit when they are performing their normal job functions).  In *Muno v. Condell Medical Center*, 891 N.E.2d 495, 498-99 (Ill. App. Ct. 2008), an Illinois appellate court discussed the two approaches, but decided the dispute on other grounds, and the issue remains unresolved by the Illinois Supreme Court.

directly from the service performed.  In other words, a fee is generated by and tied to the service performed."[49]  In contrast, the word "compensation" does not imply a payment tied to a specific service.  Black's Law Dictionary defines "compensation" as "remuneration and other benefits received in return for services rendered; esp., salary or wages."[50]  Thus, one is compensated while rendering a service, although the person is not paid a fee for that purpose.

The statement of purpose of the Illinois Good Samaritan Act, cited by neither party, states:

> The General Assembly has established numerous protections for the generous and compassionate acts of its citizens who volunteer their time and talents to help others. These protections or good samaritan provisions have been codified in many Acts of the Illinois Compiled Statutes. This Act recodifies existing good samaritan provisions. Further, without limitation the provisions of this Act shall be liberally construed to encourage persons to volunteer their time and talents.[51]

On-duty flight attendants are required to receive training in emergency services, and are not persons who "volunteer their time and talents."  They are not "good samaritans" as that term is used in the statute; rather, they are professionals performing services within their job duties. They perform such services for compensation, and thus are not entitled to immunity under the Good Samaritan Act.

## IV.    Violation of ACAA

Plaintiffs also seek damages for Mr. Tobin's death based on a theory that his death was directly caused by a violation of the ACAA.  Defendants argue they are entitled to summary judgment on Plaintiffs' ACAA claims because Plaintiffs have offered no evidence that a violation of ACAA occurred.[52]  First, the Defendants argue that ACAA was only intended to

---

[49] *In re Heanue*, 823 N.E.2d at 1128-29.
[50] Black's Law Dictionary (8th ed. 2004).
[51] 745 Ill. Comp. Stat. § 49/2 (1997).
[52] Defendants also advance an argument that ACAA does not provide a private cause of action, but the Court rejected this argument in its denial of Defendants' Motion to Dismiss.

protect persons with disabilities, and Mr. Tobin did not have a disability.  They argue that "the idea that such a scenario provides a cause of action under . . . ACAA is simply illogical, and Plaintiffs should not be able to maintain an action under . . . ACAA—a disability statute—based on the death of a nondisabled person."  The Court agrees for the same reasons explained in the negligence *per se* section above.  In addition, any violation of ACAA, if one occurred, was not the proximate cause of Mr. Tobin's injury.  To allow recovery for Mr. Tobin's injuries under these circumstances under a statute intended to guarantee disabled persons equal access to air travel would twist the meaning of the statute beyond recognition.

Alternatively, the Court is unconvinced that a violation of ACAA occurred.  The section of the Code of Federal Regulations applicable to ACAA in May 2007,[53] entitled "Provision of services and equipment," provides:

> Carriers shall ensure that qualified individuals with a disability are provided the following services and equipment:
>
> (a) Carriers shall provide assistance requested by or on behalf of qualified individuals with a disability, or offered by air carrier personnel and accepted by qualified individuals with a disability, in enplaning and deplaning. The delivering carrier shall be responsible for assistance in making flight connections and transportation between gates.
>
>> (1) This assistance shall include, as needed, the services personnel and the use of ground wheelchairs, boarding wheelchairs, on-board wheelchairs where provided in accordance with this part, and ramps or mechanical lifts.
>
> . . .
>
> (c) Carriers are not required to provide extensive special assistance to qualified individuals with a disability. For purposes of this section, extensive special assistance includes the following activities: (1) Assistance in actual eating; (2) Assistance within the restroom or assistance at the passenger's seat with elimination functions; (3) Provision of medical services.[54]

---

[53] 14 C.F.R. § 382.39.  This Section has been amended since the filing of this lawsuit, but neither party argues that the amendment should be given retroactive effect.
[54] 14 C.F.R. § 382.39 (2001).

Defendants argue that the "requested by" language and specific enumeration of various types of assistance provides two independent grounds for summary judgment: (1) that the Tobins did not "request assistance," and (2) that the regulation does not require the provision of an electric cart as Plaintiffs claim.  The evidence shows that Mr. Tobin asked the American Eagle flight agents "how do you suggest we get [to the connecting next gate]," but that the Tobins never explicitly requested transfer assistance.  Mrs. Tobin stated in her deposition that she had not requested a transport wagon, the absence of which is essentially the basis for her ACAA claim against American Eagle.  She urges that she "wouldn't think that it would be my responsibility or his responsibility to do that.  If they [the airlines] know that you are on board and that you need help and they're an hour and 15 minutes late getting in and you've only got 15 minutes to get there, I don't know how they would anticipate that you would be able to do that [absent an electric cart]."[55]  The Court does not believe that assistance is required absent a specific request by or on behalf of the disabled passenger, and no such request was made here.

## V.      Preemption

Defendants next argue that Plaintiffs' claims are preempted by the Federal Aviation Act of 1958 (FAA) and the Airline Deregulation Act of 1978 ("the Deregulation Act").

### A.  FAA Preemption

Defendants first argue that by the FAA, Congress intended to occupy the field of aviation safety and service aboard all passenger aircraft.  They argue that allowing a Texas jury to decide whether Defendants should have performed additional services above that required by federal law would conflict with federal law and violate the Supremacy Clause.  In support, Defendants largely point to the federal regulations implementing ACAA.

---

[55] Defendants' Motion Appendix at 37.

The Court is not now prepared to conclude that, by passing ACAA, Congress intended to occupy the legislative field so "as to make reasonable the inference that Congress left no room for the States to supplement it,"[56] given that the ACAA regulations provide an inclusive, rather than exclusive, list of the airlines' responsibilities and duties owed to disabled travelers. Defendants also fail to identify any federal regulation which covers oral advice given to a passenger about hurrying to a gate. At this time, the Court denies Defendants' Motion based on FAA preemption of the claims at issue. Based upon the proof at trial on the Plaintiffs' specific claims, the issue may later be reurged.

### B. Deregulation Act Preemption

Defendants also argue that the Deregulation Act preempts Plaintiffs' claims.[57] Congress passed the Deregulation Act to dismantle the pervasive federal regulation of the airline industry established by the FAA.[58] Section 31713(b)(1) of the Deregulation Act[59] preempts state enforcement of any law "relating to rates, routes, or services" of any air carrier.[60] In *Hodges v. Delta Airlines, Inc.*, the Fifth Circuit, sitting *en banc*, found that "services" under the Deregulation Act means "a bargained-for or anticipated provision of labor from one party to another,"[61] and airline "services" include "ticketing, boarding procedures, provision of food and

---

[56] *Fidelity Fed. Sav. and Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982).

[57] *Hodges v. Delta Airlines, Inc.*, 44 F.3d 334, 336 (5th Cir. 1995) (en banc).

[58] *Id.* at 335-36.

[59] "Except as provided in this subsection, a State ... may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier that may provide air transportation under this subpart." Earlier cases refer to § 1305(a), which was recodified in 1994 with minor changes in language. *See In re Am. Airlines, Inc., Privacy Litig.*, 370 F.Supp.2d 552, 561 n.18 (N.D. Tex. 2005) (Fitzwater, J.).

[60] *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992).

[61] *Hodges*, 44 F.3d at 336 ("Services" generally represent a bargained-for or anticipated provision of labor from one party to another. If the element of bargain or agreement is incorporated in our understanding of services, it leads to a concern with the contractual arrangement between the airline and the user of the service. Elements of the air carrier service bargain include items such as ticketing, boarding procedures, provision of food and drink, and baggage handling, in addition to the transportation itself. These matters are all appurtenant and necessarily included with the contract of carriage between the passenger or shipper and the airline. It is these [contractual] features of air

18

drink, and baggage handling, in addition to the transportation itself."[62]   The Deregulation Act has

a broad preemptive scope, preempting state law claims having a "connection with" or "reference

to" airline rates, routes, or services.[63]   However, the Deregulation Act does not preempt state law

tort actions for physical injuries or property damage caused by the "operation and maintenance"

of aircraft.[64]   For example, in *Hodges*, a box of rum fell out of an overhead bin during a flight,

injuring a passenger, who then asserted state law tort claims.   The court held that because the

claim did not make any specific reference to airline services, and involved the aircraft's

operation and maintenance, it was not preempted by the Deregulation Act.[65]

Defendants argue that assistance to the connecting gates is a "service" within the

meaning of the Deregulation Act.   Defendants characterize transfer assistance as part of the

"bargained-for or anticipated labor" arising out of the contractual relationship between

passengers and the airline.   The Court will not now so hold.   When Mr. Tobin spoke to the

American Eagle gate agents, he and his wife had already deplaned, and were moving from one

flight to the next.   They were not traveling on or boarding an airplane, nor enjoying any of the

airlines' services.   Thus, the Court will not now hold that such claims are preempted by the

Deregulation Act.

Likewise, the Court will not now hold that the Deregulation Act preempts the claims

stemming from American Airlines' alleged negligence in attending to Mr. Tobin.   Such claims

do not appear to relate to any part of the bargained-for labor inherent in air travel, but rather to

the operation of the aircraft.   At this time, the Court concludes that, as in *Hodges*, those claims

---

transportation that we believe Congress intended to de-regulate as 'services' and broadly to protect from state regulation.").

[62] *Id*.

[63] *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992).

[64] *Hodges*, 44 F.3d at 336.

[65] *Id*. at 340 (emphasis added).

are tort actions derived from events that happened to occur on an airplane.  Whether American

Airlines' employees were negligent when trying to attend to Mr. Tobin has to do with whether it

operates its aircraft in a safe manner.  The setting of the accident does not make the emergency

care a "service" under the Deregulation Act; Mr. Tobin's emergency could just as easily have

happened anywhere else.  The record does not support the Court holding that the Deregulation

Act was intended to preempt state law claims stemming from medical emergencies occurring in

airplanes, especially those still parked at the gate, just as it does not preempt state law claims

from items falling out of an overhead bin.

VI.     **Punitive Damages**

        The punitive damages claim triggers a choice of law issue: Plaintiffs argue that the Court

should apply Texas law, because Texas has the most significant interest in deterring willful and

wanton misconduct by Texas corporations, such as Defendants, and because Defendants'

corporate decisions were made in Texas.  Illinois law does not permit the award of punitive

damages in wrongful death actions, and Defendants ask the Court to apply Illinois law, where the

incident occurred.  The Court finds that Texas law should apply, because Texas has an interest in

whether allegedly wrongful acts committed by Texas corporations should be punished.  Illinois

has no interest in shielding a foreign company from such liability.

        In Texas, punitive damages are only available if a plaintiff proves by clear and

convincing evidence that a defendant committed fraud, acted with malice, or was grossly

negligent.[66]  Further, Texas law only allows punitive damages against an employer or corporation

for the acts of its employees if a vice principal authorizes, approves, or ratifies the act.[67]  A vice

principal of a corporation has the authority to hire, discharge, and direct employees of the

---

[66] Tex. Civ. Prac. & Rem. Code Ann. § 41.003(a) (Vernon 2007).
[67] *Qwest Int'l Commc'ns, Inc. v. AT&T Corp.*, 167 S.W.3d 324, 326 (Tex. 2005).

corporation, or the authority to manage its business.[68]  It is undisputed that Defendants did not

commit fraud or act with malice, and thus punitive damages would only be available upon a

finding of gross negligence by the Defendants' vice principals.  Gross negligence contains both

objective and subjective elements, and refers to an act or omission: (1) which when viewed

objectively from the standpoint of the actor at the time of its occurrence involves an extreme

degree of risk, considering the probability and magnitude of the potential harm to others; and (2)

of which the actor has actual, subjective awareness of the risk involved, but nevertheless

proceeds with conscious indifference to the rights, safety, or welfare of others.[69]

     Plaintiffs argue that the New England Journal of Medicine article discussed above,

entitled "Use of Automated External Defibrillators by a U.S. Airline," proves Defendants had

actual knowledge of the need to train their flight attendants to ignore advice given by volunteer

medical personnel onboard an aircraft during an emergency.  The article, which was co-authored

by nine writers, including David McKenas, then American Airlines' Medical Director,

summarizes the results of a statistical analysis of American Airlines' use of automated external

defibrillator (AED) over two years.[70]  Ultimately, the article concludes that "attendants must be .

. . instructed to deliver care without delay or interference from medical personnel who volunteer

assistance."  In contrast, American Airlines trains its flight personnel to defer to the judgment of

medical personnel on the scene when deciding whether to use a defibrillator.[71]  Accordingly,

Plaintiffs argue that genuine issues of fact exist as to whether Marie Whitworth, American

Airlines' Manager of Program Development, and/or American Airlines' Medical Director were

---

[68] *See Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917, 921-22 (Tex. 1998).
[69] Tex. Civ. Prac. & Rem. Code Ann. § 41.001(11) (Vernon 2007).
[70] The data was drawn primarily from American Airlines, but the success of other airlines in using AEDs was discussed as well.
[71] Plaintiff's Appendix at 59.

grossly negligent by consciously designing a program that did not instruct flight attendants to ignore others' advice about using AEDs.

Defendants argue that the Plaintiffs' contention that Defendants should have established AED policies that flight attendants should not defer to volunteers is illogical, and that the evidence is insufficient to support an award of punitive damages.

While it appears very unlikely from the summary judgment evidence that a jury could conclude that Defendants acted with gross negligence, the Court concludes it is premature to grant summary judgment on this issue.  If, at the close of the evidence, Plaintiffs have failed to present evidence that could support a jury verdict for punitive damages, Defendants may renew their Motion.

<em>Conclusion</em>

For the foregoing reasons, Defendants are entitled to summary judgment on claims stemming from alleged violations of ACAA and the related negligence *per se* claims, and to that extent, the Motion for Summary Judgment is **GRANTED**, and Plaintiffs shall take nothing on these claims.  However, American Airlines' agents are not entitled to immunity under the Illinois AED Act or Illinois Good Samaritan Act, and the Court now rejects, without prejudice, the contention that Plaintiffs' claims are preempted by the FAA or the Deregulation Act.  Those portions of the Motion, as well as that seeking summary judgment on the punitive damages claims, are **DENIED**.

**SO ORDERED**.

July 8, 2009.

**BARBARA M. G. LYNN**
**UNITED STATES DISTRICT JUDGE**
**NORTHERN DISTRICT OF TEXAS**